IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
January 7, 2026 Session

## ZURICH AMERICAN INSURANCE COMPANY v. TOM JAMES COMPANY ET AL.

**Appeal from the Chancery Court for Williamson County**
**No. 20CV-50006      Deanna B. Johnson, Chancellor**

_____

### No. M2025-00404-COA-R9-CV

_____

This is an interlocutory appeal concerning the scope of a commercial property insurance policy and whether the insured has stated sufficient facts to invoke coverage. The insurer filed a complaint for a declaratory judgment, seeking a declaration that the policy at issue did not provide coverage for the insured's claimed losses. The insured filed a counterclaim seeking a declaratory judgment that the policy provided coverage and asserting a breach of contract claim. The insurer filed a motion to dismiss and for judgment on the pleadings, which the trial court denied. We granted permission for an interlocutory appeal. After interpreting the policy, we determine that the insured failed to invoke coverage, and we reverse the trial court's contrary finding. However, we affirm the trial court's denial of the motion to dismiss, finding that the counterclaim sufficiently stated a claim for a declaratory judgment. Because the pleadings had not closed when the trial court ruled on the motion for judgment on the pleadings, we vacate the order of the trial court and remand for further proceedings.

**Tenn. R. App. P. 9 Interlocutory Appeal; Judgment of the Chancery Court
Affirmed in Part, Reversed in Part, Vacated and Remanded**

ANDY D. BENNETT, J., delivered the opinion of the Court, in which W. NEAL MCBRAYER and JEFFREY USMAN, JJ., joined.

William H. Tate, Brentwood, Tennessee, Eileen King Bower, Chicago, Illinois, and Patrick F. Hofer, Washington, D.C., for the appellant, Zurich American Insurance Company.

Eric Grant Osborne, Andree S. Blumstein, Brettson Bauer, and Lauren Zehr Curry, Nashville, Tennessee, and George M. Plews and Christopher Kozak, Indianapolis, Indiana, for the appellees, Tom James Company, Tom James Chile, S.A., Crossville Fabric Chile, S.A., English American Tailoring Company, Franklin Clothing Company, Holland and

Sherry, Inc., IAG Industrial Center, Inc, Individualized Shirt Company, Oxxford Clothes XX, Inc., The Hancock Company, and The Pickett Company.

## OPINION

### FACTUAL AND PROCEDURAL BACKGROUND

This case concerns a complaint for a declaratory judgment filed in Williamson County Chancery Court by Zurich American Insurance Company ("Zurich"), seeking to have the court declare that the commercial property insurance policy it had issued to a Franklin, Tennessee-based custom clothing business, Tom James Company, and its subsidiaries[1] (collectively, "Tom James") did not cover the business's claimed losses. The complaint alleged that, in April 2020, Tom James informed Zurich that, due to the COVID-19 pandemic and the resulting restrictions issued by various local, state, and national governments, numerous Tom James locations, both in the United States and globally, were required to close or limit operations, resulting in Tom James suffering financial losses. Tom James thereafter claimed coverage for these losses, and Zurich denied the claims.

In the complaint, Zurich asserted that the policy did not cover the lost business income because it required the loss to be the result of "direct physical loss of or damage to property," which Zurich claimed Tom James's claim failed to allege, and because the policy contained exclusions that precluded recovery based on the alleged causes of loss. The policy provided that: "This Policy Insures against direct physical loss of or damage caused by a Covered Cause of Loss to Covered Property, at an Insured Location[2] described in Section II-2.01, all subject to the terms, conditions and exclusions stated in this Policy." The policy defined "Covered Cause of Loss" as "all risks of direct physical loss of or damage from any cause unless excluded." Tom James claimed coverage under the "Time Element" provision, which provided that:

> The Company will pay for the actual Time Element loss the Insured sustains, as provided in the Time Element Coverages, during the Period of Liability. The Time Element loss must result from the necessary Suspension of the Insured's business activities at an Insured Location. The Suspension must be due to direct physical loss of or damage to Property (of the type insurable

---

[1] Tom James is a vertically integrated custom clothing manufacturer with subsidiaries located globally. The United States-based subsidiaries are: English American Tailoring Co., Individualized Shirt Co., Oxxford Clothes XX, Inc., Franklin Clothing Co., IAG Industrial Center, Inc., The Hancock Co., and The Pickett Co. Tom James had two Chilean subsidiaries: Crossville Fabric Chile S.A., and Tom James Chile S.A. Tom James had two subsidiaries based in the United Kingdom: Holland & Sherry and Clissold. Finally, Tom James also had one subsidiary based in Canada: Coppley.

[2] The "insured locations" were listed in an appendix to the contract. There is no dispute in this case regarding whether the locations at issue were covered.

under this Policy other than Finished Stock) caused by a Covered Cause of Loss at the Location, or as provided in Off Premises Storage for Property Under Construction Coverages.

Under the Time Element coverage, Zurich's liability was limited to the "Period of Liability," which varied depending on the property's location. For domestic locations, the Period of Liability covered the loss of Gross Earnings during:

The period starting from the time of physical loss or damage of the type insured against and ending when with due diligence and dispatch the building and equipment could be repaired or replaced, and made ready for operations under the same or equivalent physical and operating conditions that existed prior to the damage.

For Tom James's international locations, the policy covered the loss of Gross Profits during:

The period starting from the time of direct physical loss or damage of the type insured against and ending not later than the period of time shown in 2.03.09 [24 months], during which period the results of the business shall be directly affected by such direct physical loss or damage.

The two periods of liability are defined by what the parties refer to as the "period of restoration." For Tom James's domestic locations, this was "the period starting with the time of physical loss . . . and ending when[,] with due diligence and dispatch the building and equipment could be repaired or replaced." For Tom James's international locations, the period of restoration was effectively defined as 24 months. The policy also contained numerous exclusions that Zurich asserted precluded coverage.

Tom James responded by filing a motion to dismiss, asserting that the complaint should be dismissed because of a lawsuit Tom James had previously filed in Indiana state court concerning the same subject matter. While the motion to dismiss was pending, in April 2021, Tom James filed its answer and a counterclaim for a declaratory judgment, seeking a declaration that the policy provided coverage for the claimed losses and including a jury demand. The counterclaim also asserted that Zurich had breached the parties' insurance contract. In May 2021, before the trial court ruled on the pending motion to dismiss, Zurich filed its answer to Tom James's counterclaim and asserted numerous affirmative defenses, including reiterating that the policy did not cover the claimed losses. Zurich also filed the first motion for judgment on the pleadings.

In May 2021, the trial court entered an order staying the Tennessee proceedings until the Indiana litigation had concluded. In April 2024, the parties filed a joint motion to lift the stay because the Indiana litigation was dismissed for lack of personal jurisdiction

over Zurich, and the appellate process had concluded. The next month, the trial court entered an order lifting the stay and directing Tom James to either file an amended pleading or a motion for leave to amend. Tom James later filed a motion for leave to file an amended counterclaim, which the trial court granted in July 2024, and then filed an amended counterclaim.

On August 16, 2024, Zurich filed the second motion for judgment on the pleadings and a motion to dismiss Tom James's amended counterclaim. In response, Tom James filed a brief in opposition to both motions, and Zurich filed a reply in support of its motion. The court heard the motions on November 12, 2024, and in December 2024, entered a memorandum and order denying both motions. In the order, the trial court reasoned that there were three requirements for coverage under the policy. First, the lost income must have resulted from a necessary slowdown or cessation of the policyholder's business activities at an insured location, a requirement which the trial court found to be undisputed. Second, the slowdown or cessation must have resulted from "direct physical loss of or damage to property." Third, the direct physical loss of or damage to property must have been caused by a covered cause of loss, meaning that the policy did not exclude the source of the loss. The parties' dispute revolved around the interpretation and application of the latter two requirements.

The trial court then analyzed whether there had been "a direct physical loss of or damage to property." The court first noted that the policy did not define the term and that the parties had offered competing interpretations, both of which the court considered reasonable. Because of this, and because "a reasonable layperson in Tennessee" could interpret this language to mean either Tom James's interpretation—the "complete inability to access some of" Tom James's facilities, or Zurich's interpretation—physical damage requiring repair or replacement, the court found the term to be ambiguous. Because the term was ambiguous, the court reasoned, it must be construed against Zurich. The court also distinguished cases from other jurisdictions that had come to the opposite conclusion.

The trial court then turned to the exclusions Zurich asserted precluded coverage: the "Contamination" and "Law or Ordinance" exclusions. The court first examined the contamination exclusion, which barred coverage for damage or any costs arising from "contamination," defined in the policy as "any condition of property due to the actual presence of any . . . virus[.]" The court found this exclusion inapplicable because it required the "actual presence" of the virus, which Tom James had not claimed. Additionally, the court reasoned that "the governmental mandates related to COVID-19 were not issued due to the presence of COVID-19," but rather "the orders were made to preemptively prevent the further spread of" the virus. Turning next to the law or ordinance exclusion—which barred coverage for "loss or damage arising from the enforcement of any law, ordinance, regulation or rule regulating or restricting the . . . occupancy, operation or other use . . . of any property," the trial court reasoned that this exclusion did not apply because the loss arose from executive orders, and the court found it unclear whether a layperson in

Tennessee would regard an executive order as a law or ordinance. Therefore, the court reasoned that Zurich had failed to meet its burden and denied both motions.

Zurich filed a motion to revise the order or, in the alternative, to certify several issues for interlocutory appeal. On March 13, 2025, the chancery court granted the motion to revise and amended the order to address arguments Zurich had made in a reply brief that the court had not addressed; however, the court continued to deny Zurich's motions. The trial court also granted Zurich's motion to certify its ruling for interlocutory appeal. We then granted permission to appeal.

Zurich presents several issues for our review, which we restate as follows: whether Tom James's amended counterclaim properly states a claim for coverage under its commercial property insurance policy by alleging that the government orders at issue caused it to sustain a "direct physical loss" of its properties; and, if so, whether an exclusion bars coverage.[3]

## STANDARD OF REVIEW

We apply the same standard of review in an interlocutory appeal as we do in an appeal as of right. *In re Markus E.*, No. M2024-00797-COA-R9-JV, 2025 WL 1906038, at *3 (Tenn. Ct. App. July 10, 2025) (citing *Peck v. Tanner*, 181 S.W.3d 262, 265 (Tenn. 2005)). In an interlocutory appeal, courts are limited to reviewing the issues that are "clearly within the scope of the issue[s] certified for interlocutory appeal." *Fisher v.*

---

[3] The issues as certified for review are as follows:

1. Does Tom James's Amended Counterclaim state a legally sufficient claim for coverage under a commercial property insurance policy under Tennessee law by alleging that government orders issued to slow the spread of COVID-19 during the global pandemic caused "direct physical loss" of its properties?

2. Does the exclusion in Tom James Company's commercial property insurance policy barring coverage for "Loss or damage arising from the enforcement of any law, ordinance, regulation or rule regulating or restricting the . . . occupancy, operation or other use . . . of any property" preclude Tom James's claim for coverage for its alleged business loss due to government orders issued to slow the spread of COVID-19?

3. Does the exclusion in Tom James Company's commercial property insurance policy barring coverage for "Contamination, and any cost due to Contamination including the inability to use or occupy property," which defines "Contamination" as "any condition of property due to the actual presence of any . . . virus," preclude Tom James's claim for coverage for its alleged business loss due to government orders issued to slow the spread of COVID-19?

4. Does the exclusion in Tom James Company's commercial property insurance policy barring coverage for physical loss or damage directly or indirectly caused by "confiscation, requisition, seizure or destruction by the government or any public authority" preclude Tom James's claim that certain governments effectively dispossessed Tom James of its property?

*Hargett*, 604 S.W.3d 381, 393 (Tenn. 2020). This interlocutory appeal presents only questions regarding the scope of insurance coverage, which presents a question of law, and our review is therefore de novo, with no presumption of correctness to the decision below. *Clark v. Sputniks, LLC*, 368 S.W.3d 431, 436-37 (Tenn. 2012).

ANALYSIS

I. Interpretation of the Contract

This interlocutory appeal concerns a contract for commercial property insurance issued by Zurich to Tom James. We agreed to answer the legal question of whether the amended counterclaim properly invoked coverage under the policy. This necessarily requires us to interpret the contract. As our Supreme Court has explained:

> "[I]nsurance policies are, at their core, contracts." *Allstate Ins. Co. v. Tarrant*, 363 S.W.3d 508, 527 (Tenn. 2012) (Koch, J., dissenting). As such, courts interpret insurance policies using the same tenets that guide the construction of any other contract. *Am. Justice Ins. Reciprocal v. Hutchison*, 15 S.W.3d 811, 814 (Tenn. 2000). Thus, the terms of an insurance policy "'should be given their plain and ordinary meaning, for the primary rule of contract interpretation is to ascertain and give effect to the intent of the parties.'" *Clark*, 368 S.W.3d at 441 (quoting *U.S. Bank*[*, N.A. v. Tenn. Farmers Mut. Ins. Co.*], 277 S.W.3d [277, 386-87 (Tenn. 2009)]). The policy should be construed "as a whole in a reasonable and logical manner," *Standard Fire Ins. Co. v. Chester-O'Donley & Assocs.*, 972 S.W.2d 1, 7 (Tenn. Ct. App. 1998), and the language in dispute should be examined in the context of the entire agreement, *Cocke Cty. Bd. of Hwy. Comm'rs v. Newport Utils. Bd.*, 690 S.W.2d 231, 237 (Tenn. 1985).
>
> In addition, contracts of insurance are strictly construed in favor of the insured, and if the disputed provision is susceptible to more than one plausible meaning, the meaning favorable to the insured controls. *Tata v. Nichols*, 848 S.W.2d 649, 650 (Tenn. 1993); *VanBebber v. Roach*, 252 S.W.3d 279, 284 (Tenn. Ct. App. 2007). However, a "strained construction may not be placed on the language used to find ambiguity where none exists." *Farmers-Peoples Bank v. Clemmer*, 519 S.W.2d 801, 805 (Tenn. 1975).

*Garrison v. Bickford*, 377 S.W.3d 659, 663-64 (Tenn. 2012). The term "ordinary meaning" is defined as "'the meaning which the average policy holder and insurer would attach' to the policy language." *Artist Bldg. Partners v. Auto-Owners Mut. Ins. Co.*, 435 S.W.3d 202, 216 (Tenn. Ct. App. 2013) (quoting *Swindler v. St. Paul Fire & Marine Ins. Co.*, 444 S.W.2d 147, 148 (1969)).

## A. Direct physical loss

Tom James's amended counterclaim sought a declaratory judgment regarding whether the policy covered Tom James's claimed losses. The trial court found that both Tom James's and Zurich's definitions of "direct physical loss" were reasonable and that the term was ambiguous. Therefore, the first issue we address is whether this term was ambiguous. We find the term to be unambiguous and explain its meaning. We then review whether Tom James's counterclaim alleged facts sufficient to support its claimed losses.

### a. The meaning of "direct physical loss"

Tom James asserted, and the trial court found, that the term "direct physical loss of property" was ambiguous.[4] Although the term is used throughout the policy, the parties' arguments are centered on its use in the Time Element coverage provision. For the following reasons, we find the language to be unambiguous.

As stated above, a court's primary purpose in contract interpretation is "to ascertain the intention of the parties and to give effect to that intention, consistent with legal principles." *Bob Pearsall Motors, Inc. v. Regal Chrysler-Plymouth, Inc.*, 521 S.W.2d 578, 580 (Tenn. 1975). We seek to identify the intention of the parties "based upon the usual, natural, and ordinary meaning of the contractual language." *Guiliano v. Cleo, Inc.*, 995 S.W.2d 88, 95 (Tenn. 1999).[5] Determining the intention of the parties generally presents a question of law "because the words of the contract are definite and undisputed, and in deciding the legal effect of the words, there is no genuine factual issue left for a jury to decide." *Planters Gin Co. v. Fed. Compress & Warehouse Co., Inc.*, 78 S.W.3d 885, 890 (Tenn. 2002) (citing 5 Joseph M. Perillo, CORBIN ON CONTRACTS, § 24.30 (rev. ed. 1998)). When the language of the contract is unambiguous, "the literal meaning controls the outcome of the dispute." *Id.*

However, where a contractual provision is susceptible to more than one reasonable interpretation, this may render the term ambiguous. *Maggart v. Almany Realtors, Inc.*, 259 S.W.3d 700, 704 (Tenn. 2008). "'Ambiguity, however, does not arise in a contract merely because the parties may differ as to interpretations of certain of its provisions. A contract

---

[4] Although the policy also covered "physical damage" to property, Tom James did not claim that any property was physically damaged. Therefore, our analysis is focused on whether any "direct physical loss" of property was properly alleged.

[5] The trial court placed primary emphasis on caselaw that held that insurance contracts must be read as a layperson would. *See, e.g.*, *Martin v. Powers*, 505 S.W.3d 512, 517 (Tenn. 2016). However, reading the policy as a layperson does not alter the analysis regarding whether an ambiguity exists. Reading the policy as a layperson instead contemplates not needing to "'consult a long line of case law or law review articles and treatises to determine'" the extent of coverage. *Id.* (quoting *Harrell v. Minn. Mut. Ins. Co.*, 937 S.W.2d 809, 814 (Tenn. 1996)). Consulting dictionary definitions and using the provision's definitions satisfies this standard.

is ambiguous only when it is of uncertain meaning and may fairly be understood in more ways than one.'" *Id.* (quoting *Johnson v. Johnson*, 37 S.W.3d 892, 896 (Tenn. 2001)).[6] If a term is found to be ambiguous, i.e., that it is "'susceptible to more than one plausible meaning,'" then "'the meaning favorable to the insured controls.'" *Martin*, 505 S.W.3d at 517 (quoting *Garrison*, 377 S.W.3d at 664). Further, courts should examine any disputed terms in the context of the agreement as a whole. *Id.*

To begin our analysis, we recite the relevant policy provision that contains the disputed term:

> The Company will pay for the actual Time Element loss the Insured sustains, as provided in the Time Element Coverages, during the Period of Liability. The Time Element loss must result from the necessary Suspension of the Insured's business activities at an Insured Location. The Suspension must be due to direct physical loss of or damage to Property (of the type insurable under this Policy other than Finished Stock) caused by a Covered Cause of Loss at the Location, or as provided in Off Premises Storage for Property Under Construction Coverages.

The parties offered competing meanings regarding "direct physical loss." Thus, we must determine the meaning of "direct physical loss." We begin by examining the parties' competing interpretations. *See 101 Constr. Co. v. Hammet*, 603 S.W.3d 786, 795-96 (Tenn. Ct. App. 2019) (citing *Allstate Ins. Co. v. Watson*, 195 S.W.3d 609, 611 (Tenn. 2006)) (stating that, to determine if ambiguity exists, "it is necessary to consider the competing interpretations"). Zurich asserts that this provision, "based on its plain and ordinary meaning," when read in context, "requires a total physical dispossession of property, like theft or total destruction." However, Zurich asserts that this requirement "is related to but distinct" from physical damage. To the contrary, Tom James asserts that "direct physical loss" includes situations like the present matter, where property is rendered "practically useless" or is entirely prevented from being accessed. Therefore, Tom James asserts, the government orders at issue fall within the scope of the policy. Tom James also agrees that situations like theft are covered under the policy and, as will be discussed later, asserts that the government orders were tantamount to theft. For the following reasons, we find Zurich's interpretation to be the reasonable interpretation.[7]

---

[6] We note that, even if a court finds that a contractual provision is susceptible to two reasonable interpretations, this is not the end of the inquiry. Instead, "[o]nce [a provision is] found to be ambiguous, a court applies established rules of construction to determine the parties' intent." *Planters Gin Co.*, 78 S.W.3d at 890. Only if, after the court applies the rules of construction, ambiguity remains, does the meaning become a factual question. *Id.* (citing *Smith v. Seaboard Coast Line R.R. Co.*, 639 F.2d 1235, 1239 (5th Cir. 1981)).

[7] Because we do not find the terms to be ambiguous, we need not consult any extrinsic evidence. *See 101 Constr. Co.*, 603 S.W.3d at 798 ("In the absence of an ambiguity, we apply the plain language of the

The operative term "direct physical loss" is not defined in the contract. To aid in ascertaining the plain, ordinary, and popular meaning of the terms, courts regularly consult dictionaries to provide definitions. *Strategic Acquisitions Grp., LLC v. Premier Parking of Tenn., LLC*, No. E2019-01631-COA-R3-CV, 2020 WL 2595869, at *5 (Tenn. Ct. App. May 22, 2020). *Black's Law Dictionary* defines "direct" as "[f]ree from extraneous influence; immediate;" "physical" as "[o]f, relating to, or involving material things; pertaining to real, tangible objects;" and "loss" as "[t]he failure to maintain possession of something." BLACK'S LAW DICTIONARY (12th ed. 2024). We find nothing unexpected from consulting these dictionary definitions.

From the parties' briefing, both in the trial court and on appeal, it is evident that there has been no shortage of ink spilled over the phrase "direct physical loss." Courts from around the country, both state and federal, have defined this phrase.[8] For example, the Sixth Circuit defined this phrase thusly:

> "Direct" means "[e]ffected or existing without intermediation or intervening agency; immediate." *Oxford English Dictionary Online* (3d ed. 2021). "Physical" means "natural; tangible, concrete." *Id.* "Loss" means "[p]erdition, ruin, destruction; the condition or fact of being 'lost,' destroyed, or ruined," or "being deprived of." *Id.* And "property" means "any residential or other building (with or without associated land) or separately owned part of such building (as an apartment, etc.)," as well as "[s]omething belonging to a thing; an appurtenance; an adjunct." *Id.*

*Santo's Italian Café LLC v. Acuity Ins. Co.*, 15 F.4th 398, 401 (6th Cir. 2021). That court found that, even under "a thesaurus-rich paraphrase of" the words "a direct physical loss of" property—i.e., "an 'immediate' 'tangible' 'deprivation' of property," the meaning stayed the same. *Id.* The Alaska Supreme Court adopted a similar understanding, noting that "Black's Law Dictionary defines 'direct' as '[f]ree from extraneous influence; immediate' [and] it defines 'physical' as '[o]f, relating to, or involving material things; pertaining to real, tangible objects.'" *Baxter Senior Living, LLC v. Zurich Am. Ins. Co.*, 556 P.3d 757, 765 (Alaska 2024) (footnote omitted).

---

contract as written without resort to extrinsic evidence."); *Crye-Leike, Inc. v. Carver*, 415 S.W.3d 808, 816 (Tenn. Ct. App. 2011) (quoting *Union Realty Co., Ltd. v. Fam. Dollar Stores of Tenn., Inc.*, 255 S.W.3d 586, 591 (Tenn. Ct. App. 2007) ("When the language of the contract is plain and unambiguous, courts determine the intentions of the parties from the four corners of the contract, interpreting and enforcing it as written.").

[8] Of course, decisions from other jurisdictions are not binding on this Court but may be persuasive authority that we find helpful in our analysis. *Allstate Prop. & Casualty Ins. Co. v. Sevier Cnty. Elec. Sys.*, 666 S.W.3d 429, 452 (Tenn. Ct. App. 2022).

From these definitions flows the concept that "direct physical loss to property requires a distinct, demonstrable, physical alteration of property." *Another Planet Ent., LLC v. Vigilant Ins. Co.*, 548 P.3d 303, 322 (Cal. 2024). As the Supreme Court of Alaska found, "'[d]irect physical loss' therefore must exclude losses that: (1) are not the immediate or closely connected outcome of some 'covered cause of loss'; or (2) are intangible or incorporeal." *Baxter Senior Living*, 556 P.3d at 765-66. That court found that a loss of use without physical alteration was "a classic example of an intangible loss," and that "'direct physical loss' must require *some* physical alteration of property or a deprivation of possession; mere loss of use is insufficient." *Id.* at 766. Stated another way, "[t]he pairing of the word 'physical' with 'loss' demonstrates 'there must be some *physicality* to the loss . . . of property—*e.g.*, a physical alteration, physical contamination, or physical destruction.'" *Another Planet*, 548 P.3d at 322 (citation modified). However, the term is broad enough to also encompass "complete physical deprivation or dispossession, such as when property is stolen." *Id.* We agree with those courts and Zurich that this is the term's "plain and ordinary meaning." *Garrison*, 377 S.W.3d at 664. Therefore, to claim coverage under the time element provision, the suspension of business activity must have been the result of a direct (i.e., immediate and without intervention) physical (i.e., tangible, concrete, or able to be perceived by the senses) loss (i.e., deprivation or dispossession) of a covered property.

The trial court's contrary finding, that it was a reasonable interpretation of this provision to include a "total deprivation of use" or a "total loss of access," was in error because it failed to account for the physicality requirement of the provision. *See Baxter Senior Living*, 556 P.3d at 765 ("While loss may by itself encompass the loss of use, the modifying adjectives 'direct' and 'physical' narrow [the phrase's] meaning."). The trial court found that "Tom James suffered a total deprivation of its property" and was physically unable to access some of its facilities, which amounted to more than simply being unable to use its property for a preferred use. However, "'[p]hysical' has to mean something," *Wakonda Club v. Selective Ins. Co. of Am.*, 973 N.W.2d 545, 552 (Iowa 2022), and courts of this State should not interpret a contract in a manner that renders a term meaningless. *Opry Mills Ltd. P'ship v. Arch Ins. Co.*, No. M2016-01763-COA-R3-CV, 2018 WL 576194, at *4 (Tenn. Ct. App. Jan. 26, 2018). Therefore, this provision required some "physical aspect to the loss of the property." *Wakonda Club*, 973 N.W.2d at 552. Indeed, a federal district court applying Tennessee law found that the provision "requires some form of tangible harm to the insured property to invoke coverage." *SFDG LLC v. Cincinnati Ins. Co.*, 558 F. Supp. 3d 590, 595 (E.D. Tenn. 2021).[9] The fact that Tom James

---

[9] Zurich cites numerous other cases from Tennessee federal courts and the Sixth Circuit in support of this conclusion. *See, e.g.*, *Creative Bus., Inc. v. Covington Specialty Ins. Co.*, 559 F.Supp.3d 660, 669 (W.D. Tenn. 2021) ("It is clear that the Business Income provision contemplates some sort of physical injury or damage to the property for coverage to apply."); *Brown Jug, Inc. v. Cincinnati Ins. Co.*, 27 F.4th 398, 403 (6th Cir. 2022) ("[G]iving the words 'direct physical loss' their ordinary meaning, we find that plaintiffs must show destruction or alteration of the property, or dispossession from the property, to recover under their insurance policies."); *Santo's Italian Café*, 15 F.4th at 401 (explaining that the "restaurant has not

was unable to physically access some of its properties does not equate to a direct physical loss of those properties. No physical dispossession occurred here. Indeed, the physical loss must have been of the properties, not merely a loss of access by Tom James. The loss of access in this case was in essence a loss of use, which, as stated above, was not covered.

## b. The periods of liability

The trial court also distinguished the current matter from other cases based on the differing periods of restoration in the periods of liability for Tom James's international locations. Tom James asserts on appeal that this language shows that physical alteration was not necessary or that this creates ambiguity. We respectfully disagree with both assertions.

At the outset, it is worth reminding ourselves of the two periods of restoration. For Tom James's domestic properties, the period of liability was defined by the period of restoration, which began with the physical loss of the property and ended when, "with due diligence and dispatch," whatever was lost "could be repaired or replaced" and "made ready for operations under the same or equivalent physical and operating conditions that existed prior to the damage." The liability period, and the corresponding period of restoration, for Tom James's international properties differed. This period of restoration again began with the physical loss of the property; however, it ended "not later than" the period of time "during which . . . the results of the business shall be directly affected by such direct physical loss or damage," or 24 months. Tom James asserts that the absence of the "repair or replace" language in the policy's period of restoration for international properties differentiates this policy from others. This, Tom James asserts, demands a different outcome from those reached by the myriad other courts that have analyzed these policies. This argument is unavailing.

While "[a]ll clauses and provisions of the contract should, if possible, be so construed as to harmonize with one another, and all the language of a contract should be construed so as to subserve, and not subvert, the general intention of the parties," *Southwind Residential Props. Ass'n, Inc. v. Ford*, No. W2016-01169-COA-R3-CV, 2017 WL 991108, at *8 (Tenn. Ct. App. Mar. 14, 2017) (citation modified), we fail to see how, when read in conjunction with the other terms of the policy, this language dictates a different outcome. It is true that other courts have bolstered their analysis through citing this provision, *see, e.g.*, *Santo's Italian Café*, 15 F.4th at 402 ("Other terms in the policy reinforce this conclusion"), but the fact that one provision of this policy lacks this language does not alter this contract's requirement of "direct physical loss" of property. While the period of liability may provide context, it does not necessarily modify or alter the contract's requirement of direct physical loss. *See, e.g.*, *D & E Constr. Co., Inc. v. Robert J. Denley*

_____

been tangibly destroyed, whether in part or in full. And the owner has not been tangibly or concretely deprived of any of it.").

- 11 -

*Co., Inc.*, 38 S.W.3d 513, 519 (Tenn. 2001) (citation modified) (stating that all of a contract's terms "must pass in review, for one clause may modify, limit or illustrate another."). Indeed, both periods of restoration begin with the physical loss of the property and, as stated above, "physical" must be given meaning in this contract.

Zurich puts forward several arguments for why the period of liability should not alter the outcome of this case, which all essentially boil down to what we have already concluded—that the policy required direct physical loss of property. One provision lacking "repair or replace" language does nothing to alter this. Tom James asserts that this reading creates contradictory interpretations. However, while it is one thing for the "repair or replace" language to add context to the policy, it is another thing altogether to allow the absence of this language to override other terms in the policy. We conclude that the period of liability language does not change the plain meaning of the policy.

### c. Total dispossession

On appeal, Tom James asserts that "physical loss" as used in the policy includes the total dispossession of real property regardless of whether the property is damaged, such as in the case of theft. Tom James further asserts that the government orders in this case were tantamount to a case of theft and that "it suffered a 'physical loss of' its property because the buildings were 'totally lost . . . during the relevant time periods'" due to government orders preventing entry of or access to its locations. As Tom James frames it, "such a total inability to enter, possess, or occupy a building is a classic 'physical loss of' that property, akin to theft, and triggers the time-element language."

Although this interpretation at first appears on sturdy ground, cracks soon begin to show and, ultimately, this interpretation cannot bear the weight placed upon it. Zurich readily admits that theft is a direct physical loss of property that would be covered. Indeed, "loss" necessarily contemplates deprivation, which "opens the door for circumstances in which property is not harmed but may not be used for some reason. It is necessarily true that property perfectly intact cannot be used if it is stolen." *Huntington Ingalls Indus. Inc. v. Ace Am. Ins. Co.*, 287 A.3d 515, 529 (Vt. 2022). However, the government orders did not "steal" any property from Tom James. Tom James's ownership or possession of the properties was never altered. What was altered, however, was Tom James's ability to access and, therefore, use the subject properties.

Courts have turned to metaphor to illuminate this difference. For example, the Sixth Circuit explained this distinction thusly: "A loss of use simply is not the same as a physical loss. It is one thing for the government to ban the use of a bike or a scooter on city sidewalks; it is quite another for someone to steal it." *Santo's Italian Café*, 15 F.4th at 402. Alternatively, as another court put it, if a thief steals a computer, it is physically lost but not necessarily physically damaged. *Chief of Staff LLC v. Hiscox Ins. Co. Inc.*, 532 F. Supp. 3d 598, 602 (N.D. Ill. 2021). However, if the thief changes the computer's password,

thereby preventing its use for a time, this fails to satisfy the provision's requirements. *Id.* These hypothetical situations highlight the issue with Tom James's assertion: the government orders did not cause anything physical to happen to the properties. Instead, the governments ordered that Tom James's access to the properties be restricted. The orders, therefore, lacked the element of physicality required by the policy.

That the government orders in some locations prevented access makes no difference under the provision. A complete loss of ability to put property to the desired use is not a physical loss or deprivation of the property. As one court put it, "'use of property' and 'property' are not the same thing, and the loss of the former does not necessarily imply the loss of the latter." *Conn. Dermatology Grp., PC v. Twin City Fire Ins. Co.*, 288 A.3d 187, 200 (Conn. 2023). A complete loss of use without some physical element does not implicate the insurance policy because the policy does not "insure *ownership rights*, . . . but *physical property*." *Id.* at 200 n.17. As the Connecticut Supreme Court noted, this argument is inconsistent with the language of the policy because "if loss of use constituted direct physical loss, then the policies would cover losses whenever a policyholder experienced a 'necessary suspension of [its] 'operations.'" *Id.* at 200-01. Yet, the policy is not so expansive. Instead, it "condition[s] such coverage on a direct physical loss of property." *Id.* at 201.

The government orders at issue in this case fail to establish a "direct physical loss" of property. *See, e.g.*, *LGW, LLC v. Cincinnati Ins. Co.*, No. 3:20-cv-00481, 2021 WL 4320487, at *5 (M.D. Tenn. Sept. 22, 2021) ("A 'direct physical loss to property' does not reasonably encompass loss of access to the property or loss of functionality of the property."). As the Sixth Circuit explained, "[i]t pays little heed to these omnipresent words in the policy, if not erases them, to construe them to cover business losses generated by a" government order. *Santo's Italian Café*, 15 F.4th at 402. As the Fifth Circuit found, compliance with government orders fully closing a business is not covered because the "loss is not tangible. Nor is it an alteration, injury, or deprivation of *property*." *Q Clothier New Orleans, L.L.C. v. Twin City Fire Ins. Co.*, 29 F.4th 252, 259 (5th Cir. 2022). Tom James's arguments all fail to overcome this obstacle because they are all premised on the government orders being equivalent to theft or effectuating a dispossession of property when the government orders failed to do either. *See King's Palace, Inc. v. Certain Underwriters at Lloyd's, London*, 558 F. Supp. 3d 636, 650-52 (W.D. Tenn. 2021) (collecting cases holding that government orders do not constitute direct physical losses and concluding that Tennessee's governor's orders did not constitute a covered source of loss).

To sum up, we do not find the policy language to be ambiguous, and we apply the language's plain ordinary meaning—that a direct physical loss of property requires some form of physicality and that the government orders at issue in this case fail to satisfy that requirement. We conclude that a "reasonable person insured under an insurance policy containing the language at issue in this case," *Martin*, 505 S.W.3d at 519, would conclude

that direct physical loss required some element of physicality and that loss of use alone was insufficient. We do not find that "repair or replace" language, whether included in the policy or absent, changed this meaning. We further conclude that the government orders were insufficient to constitute a direct physical loss of the properties.

### B. Impact of this interpretation on Tom James's claims

We turn next to whether Tom James's amended counterclaim has sufficiently stated a claim for coverage under the policy, using the above understanding. To properly claim coverage under the policy, Tom James was required to allege that its losses resulted from the necessary suspension of its business activities at an insured property that was due to "direct physical loss of or damage to property." Further, the suspension must have been the result of a covered cause of loss of each property.

From our review of Tom James's amended counterclaim, the only alleged sources of direct physical loss alleged by Tom James are government orders. A review of the allegations claiming each loss of property reveals as much. As to Tom James's Chilean locations, the counterclaim alleged that government restrictions "prevented all access to Tom James' Chilean facilities, resulting in a complete physical loss of the property." Tom James alleged that in Canada, "the Ontario Premier ordered all non-essential businesses to close effective March 25, 2020." Regarding Tom James's properties in the United Kingdom, the amended counterclaim stated that "British authorities ordered all businesses 'offering goods for sale or hire in a shop' to 'cease to carry on that business or service except by making deliveries or otherwise providing services in response to orders received remotely" and that "the Scottish government imposed similar orders." Returning stateside, Tom James alleged that, in Maryland, Illinois, Pennsylvania, Tennessee, and North Carolina, orders from each state's respective governor ceased operations at properties within those states.

Based on our previous determination that government orders do not establish a direct physical loss of property, we find, as a matter of law, that Tom James's counterclaim fails to invoke coverage under the policy. Nowhere in the complaint does Tom James allege any element of physicality as required by the policy. Count one of Tom James's counterclaim is emblematic of this issue. In this count, Tom James specifically states that its Chilean properties "suffered a total physical loss of the buildings that were ordered closed" and that "the applicable executive orders are a covered cause of loss." The same is true of count two (regarding the United Kingdom), count four (regarding Pennsylvania), and count five (regarding Maryland, Illinois, Tennessee, and North Carolina). For all of these counts, and related counts three and six (which concerned dependent gross earnings from the suspension at the insured properties), the only alleged causes of loss are executive orders. Tom James, therefore, failed to allege losses covered by the policy.

Because we find that Tom James failed to state a claim for coverage, we do not address whether any exclusions precluded coverage. The trial court's finding that Tom James had invoked coverage is reversed.

## II. Impact on the motions

Zurich requests that we reverse the trial court's denial of the motion to dismiss and for judgment on the pleadings. Zurich asserts that the trial court's order should be reversed because "Tom James does not and cannot allege facts showing 'direct physical loss' of property due to the COVID-19 government orders." For its part, Tom James asserts that the trial court correctly denied the motions. For the following reasons, we agree with the trial court that the denial of the motions was proper; however, we reach this conclusion for different reasons.[10]

### A. Motion to dismiss

We begin with Zurich's motion to dismiss Tom James's amended counterclaim. The amended counterclaim sought a declaratory judgment declaring that the insurance policy provided coverage for the claimed losses. Because the counterclaim sufficiently stated a claim for declaratory judgment, we affirm the trial court's denial of the motion to dismiss that claim.

A motion to dismiss pursuant to Tenn. R. Civ. P. 12.02(6) "'seeks only to determine whether the pleadings state a claim upon which relief can be granted.'" *Robinson v. City of Clarksville*, 673 S.W.3d 556, 566 (Tenn. Ct. App. 2023) (quoting *Edwards v. Allen*, 216 S.W.3d 278, 284 (Tenn. 2007)). "The motion 'tests the legal sufficiency of the complaint' rather than 'the strength of the plaintiff's proof.'" *Id.* (quoting *Smith v. Benihana Nat'l Corp.*, 592 S.W.3d 864, 870 (Tenn. Ct. App. 2019) (citation omitted)). A motion to dismiss should be granted when "the allegations of the complaint, if considered true, are not sufficient to constitute a cause of action as a matter of law." *Ralph v. Pipkin*, 183 S.W.3d 362, 366 (Tenn. Ct. App. 2005). When a court reviews a motion to dismiss, "[t]he relevant and material allegations of the complaint are taken as true, and the plaintiff is afforded the benefit of all reasonable inferences that may be drawn from the allegations." *Est. of Haire v. Webster*, 570 S.W.3d 683, 690 (Tenn. 2019). We review the trial court's decision on a motion to dismiss de novo, with no presumption of correctness. *Webb v. Nashville Area Hab. for Hum., Inc.*, 346 S.W.3d 422, 426 (Tenn. 2011).

The amended counterclaim sought a declaratory judgment. The Tennessee Declaratory Judgment act "permits persons interested in a written contract to obtain a declaratory judgment concerning their rights, status, or other legal relations under the

---

[10] "The Court of Appeals may affirm a judgment on different grounds than those relied on by the trial court when the trial court reached the correct result." *SmileDirectClub, Inc. v. NBCUniversal Media, LLC*, 708 S.W.3d 556, 583 n.12 (Tenn. Ct. App. 2024) (citation modified).

contract." *Dobbs v. Guenther*, 846 S.W.2d 270, 275 (Tenn. Ct. App. 1992) (citing Tenn. Code Ann. § 29-14-103). As this Court has previously explained, "a Rule 12.02(6) motion to dismiss is 'seldom appropriate in declaratory judgment actions *provided* there is an actual controversy that may be resolved by means of a declaration of the parties' respective rights.'" *Remus v. Nunn*, No. M2023-00589-COA-R3-CV, 2024 WL 1298975, at *3 (Tenn. Ct. App. Mar. 27, 2024) (quoting *Karsonovich v. Kempe*, No. M2017-01052-COA-R3-CV, 2018 WL 1091735, at *2 (Tenn. Ct. App. Feb. 27, 2018) (citation modified)); *see also Salmon v. Fellowship Bible Church of Williamson Cnty.*, No. M2024-00377-COA-R3-CV, 2024 WL 5200478, at *1-2 (Tenn. Ct. App. Dec. 23, 2024).

In light of the foregoing, "when we review a Rule 12.02(6) motion to dismiss a declaratory judgment action, our review is slightly different," *Karsonovich*, 2018 WL 1091735, at *2, and we apply the following principles:

> "When considering a motion to dismiss a declaratory judgment action it is important to recognize that the general purpose of a declaratory judgment action is not to award affirmative relief, but '*to resolve a dispute, afford relief from uncertainty with respect to rights, status, and other legal relations.*' [*Cannon Cnty. Bd. of Educ. v.*] *Wade*, 178 S.W.3d [725,] 730 [(Tenn. Ct. App. 2005)] (emphasis added). In this context, the fact that the party seeking declaratory relief is not entitled to a favorable judgment—that he, she, or it will not prevail on the issue in controversy—does not mean that the parties are not entitled to the 'relief from uncertainty that a declaratory judgment affords.' *Id.* at 730.
> . . .
> [W]hat is essential is that the party seeking the declaratory judgment state facts sufficient to demonstrate the existence of an actual controversy concerning the matter at issue in the declaratory judgment action. *See Hudson* [*v. Jones*], 278 S.W.2d [799,] 804 [(Mo. Ct. App. 1953)]; *see also* 1 Walter H. Anderson, *Actions for Declaratory Judgments* § 318, at 740 [2d ed. 1951]."

*Id.* (quoting *Blackwell v. Haslam*, No. M2011-00588-COA-R3-CV, 2012 WL 113655, at *7-8 (Tenn. Ct. App. Jan. 11, 2012)).

With these principles in mind, we determine that granting the motion to dismiss would have been incorrect. It is clear from the amended counterclaim that there is a controversy over the parties' rights, status, and other legal relations under the policy, which was a contract. Therefore, there is no question that the subject matter fell under the ambit of Tenn. Code Ann. § 29-14-103. Zurich's countervailing argument, that a declaratory judgment would declare that Tom James has not properly invoked coverage, is of no matter in deciding whether the amended counterclaim has sufficiently stated a claim because "a party seeking a declaratory judgment is not required to allege facts in its complaint

demonstrating that it is entitled to a favorable decision." *Wade*, 178 S.W.3d at 730. Instead, all that was required for the amended counterclaim to survive was to allege facts demonstrating the existence of an actual controversy concerning a matter covered by the declaratory judgment statute. *Karsonovich*, 2018 WL 1091735, at \*2. Tom James has done so here. Therefore, although for different reasons, we agree with the trial court that the motion to dismiss the amended counterclaim for a declaratory judgment should be denied.

The amended counterclaim also included a claim that Zurich had committed a breach of contract by failing to pay for the claimed losses. "In order to make a prima facie case for a breach of contract claim, a plaintiff must allege: (1) the existence of an enforceable contract, (2) nonperformance amounting to a breach of the contract, and (3) damages caused by the breach of the contract." *Whitworth v. City of Memphis*, 689 S.W.3d 579, 584 (Tenn. Ct. App. 2023) (citation modified). Tom James has properly alleged that a contract existed between the parties. Similarly, damages from the breach have also been alleged. However, problems arise when reviewing whether nonperformance has occurred. From our review, the only nonperformance alleged was that Zurich failed to pay insurance claims arising from government orders affecting its locations. We have already determined that the policy did not provide coverage for these claimed losses. Therefore, even if we assume all of the facts alleged to be true, coverage for the claimed losses was not available under the policy, meaning Zurich did not fail to perform. Therefore, the trial court erred in denying the motion to dismiss the breach of contract claim. We therefore reverse trial court's contrary decision and remand for entry of an order dismissing this claim.[11]

## B. Motion for judgment on the pleadings

We turn next to whether Zurich's request that we direct entry of judgment on the pleadings on remand is appropriate. Motions for judgment on the pleadings are governed by Tenn. R. Civ. P. 12.03, which states in pertinent part: "After the pleadings are closed but within such time as not to delay the trial, any party may move for judgment on the pleadings." Because Zurich did not file an answer to the amended counterclaim until after filing its motion for judgment on the pleadings, our determination that the amended counterclaim for a declaratory judgment properly stated a claim necessarily raises the question of whether the pleadings were closed. The Rules of Civil Procedure provide that:

> There shall be a complaint and an answer; and there shall be a reply to a counterclaim denominated as such; an answer to a cross-claim, if the answer contains a cross-claim; a third-party complaint, if a person who was not an

---

[11] Our decision to reach different outcomes on the two counts of the amended counterclaim is due to the different types of claims they seek. In the breach of contract claim, Tom James was required to allege facts amounting to nonperformance. However, in the declaratory judgment claim, Tom James was instead seeking a declaration of its rights under the insurance contract. For that claim, all Tom James was required to allege was a controversy over a matter covered by the declaratory judgment statute, which is a considerably lower hurdle than the breach of contract claim.

original party is summoned under the provisions of Rule 14; and there shall be a third-party answer, if a third-party complaint is served. No other pleading shall be allowed . . . .

TENN. R. CIV. P. 7.01. Therefore, at the time the trial court ruled on the motions, the pleadings had not yet closed.[12] Indeed, in its motion for judgment on the pleadings, Zurich asserted that, upon the trial court granting the motion to dismiss, only then would the complaint and answer be the operative pleadings. The trial court, however, denied the motion to dismiss, and we have determined that this was the correct outcome. As a result, the pleadings were not yet closed when the trial court ruled on the motion. *Cf. Cherokee Country Club, Inc. v. City of Knoxville*, 152 S.W.3d 466, 478 (Tenn. 2004) (referencing the Advisory Commission Comments to Rule 7.01 stating that the rule "'adopts the federal practice of cutting off pleadings after complaints and answer[s], except that a reply or answer by [the] plaintiff is allowed in cases of counterclaim[s]" and reasoning that, under Rule 7.01, because the defendant's answer did not contain a counterclaim, the pleadings were closed). Once the trial court denied the motion to dismiss, further consideration of the motion for judgment on the pleadings was pretermitted. Therefore, although we agree that the denial of the motion for judgment on the pleadings was appropriate, we reach this conclusion for reasons different from those of the trial court.

In summary, the trial court's conclusions of law regarding the scope of the policy and whether Tom James's amended counterclaim properly invoked coverage are reversed. We affirm the denial of the motions on other grounds. Lastly, we vacate the trial court's order and remand for entry of an order consistent with this opinion and for further proceedings.[13]

---

[12] While Zurich had previously filed an answer to Tom James's original counterclaim, once Tom James filed the amended counterclaim, Zurich's answer was no longer responsive to the operative pleading because "an 'original complaint is superseded, and its effect as a pleading destroyed, by filing an amended complaint complete in itself, [ ] which does not refer to or adopt the original as a part of it.'" *Ingram v. Gallagher*, 671 S.W.3d 428, 436 (Tenn. 2023) (quoting *Louisville & N.R. Co. v. House*, 56 S.W. 836, 836 (1900)). The amended counterclaim did not reference or adopt the original counterclaim and, therefore, completely superseded that pleading. Further, the Rules of Civil Procedure required Zurich to file an answer to the amended counterclaim. *See* TENN. R. CIV. P. 15.01 ("A party shall plead in response to an amended pleading . . ."). Therefore, the pleadings only closed upon Zurich filing its answer to the amended counterclaim.

[13] This opinion should not, however, be construed to preclude judgment on the pleadings, should either party file such a motion on remand. Entry of "a motion for judgment on the pleadings seeking declarations of the parties' rights" is appropriate "if there are no material issues of fact left to be determined." 26 C.J.S. *Declaratory Judgments* § 154; *see also* 22A AM. JUR. 2D *Declaratory Judgments* § 171 ("An action for a declaratory judgment is subject to a motion for judgment on the pleadings in the absence of questions of fact.") (footnotes omitted)). Further, "[a] motion for judgment on the pleadings is an appropriate mechanism for a party seeking a declaratory judgment regarding a contractual dispute, such as where the parties' dispute is the proper interpretation of contractual terms." 26 C.J.S. *Declaratory Judgments* § 154 (footnotes omitted).

CONCLUSION

The judgment of the trial court is affirmed in part, reversed in part, vacated, and remanded. Costs of this appeal are assessed against the appellees, Tom James Company, Tom James Chile, S.A., Crossville Fabric Chile, S.A., English American Tailoring Company, Franklin Clothing Company, Holland and Sherry, Inc., IAG Industrial Center, Inc, Individualized Shirt Company, Oxxford Clothes XX, Inc., The Hancock Company, and The Pickett Company., for which execution may issue if necessary.


/s/ Andy D. Bennett
ANDY D. BENNETT, JUDGE